2004 WY 82

**In the Interest of HP and
NP, minor children:**

**AA, Appellant (Respondent),**

v.

**The State of Wyoming, Department
of Family Services, Appellee
(Petitioner).**

**No. C–03–15.**

Supreme Court of Wyoming.

July 14, 2004.

Representing Appellant: Stacy E. Casper of Casper Law Office, LLC, Casper, WY. Argument by Ms. Casper.

Representing Appellee: Patrick J. Crank, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; and Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Guardian ad Litem: Ann M. Rochelle.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶1] Mother appeals the juvenile court order entered following a review hearing in a neglect proceeding. The juvenile court or-

dered the Department of Family Services (DFS) to pursue termination of parental rights. Mother challenges the sufficiency of the evidence regarding the juvenile court's findings. She also asserts that her fundamental rights were violated. We affirm.

## ISSUES

[¶ 2] Mother presents two issues:

I. Whether the trial court erred in finding that reasonable efforts had been made to reunify the family, that there were ongoing and persistent failures by mother to comply with basic requirements of case plan and that the children's health and safety would be jeopardized by returning the children to the mother.

II. Whether mother's fundamental rights were violated when her right to associate with her children was terminated by decision of MDT group July 1, 2002, contrary to the court's prior ruling of June 4, 2003.

The State phrases the issues as:

I. Was there sufficient evidence for the juvenile court to determine, by clear and convincing evidence, that reasonable efforts had been made to reunify the family and that the health and safety of the minor children would be jeopardized by returning the children to the mother?

II. Were Mother's rights violated in this neglect proceeding?

Finally, the Guardian Ad Litem (GAL) presents the following statement of the issues:

1. The Trial Court properly found by clear and convincing evidence that [Mother's] parental rights to her two children, [HP] and [NP] should be terminated.

2. There was no violation of [Mother's] rights by the actions of the Multi–Disciplinary Team on July 1, 2002.

## FACTS

[¶ 3] On December 4, 2001, the Natrona County Assistant District Attorney filed a petition in the juvenile court alleging that Mother's two children, HP and NP, were neglected. Prior to the petition, HP and NP had been residing in the home of their paternal grandparents and biological father (Fa-

ther). A supporting affidavit provided by DFS alleged that on December 3, 2001, DFS was informed "the family could no longer provide care for the children." At that time, the grandparents had been evicted from their home; the location of Father was unknown, but he was believed to be in the Wyoming Behavioral Institute; and Mother was incarcerated at the Natrona County Detention Center for drug issues. On December 5, 2001, Mother was sentenced to eighteen to twenty-four months at the Women's Center in Lusk, Wyoming.

[¶ 4] Additionally on December 5, 2001, the juvenile court held a shelter care hearing. Mother was present at the hearing and was advised of her rights and the allegations in the petition. Father did not attend. The juvenile court found that Mother was serving a sentence at the Women's Center. This fact, combined with Father's failure to attend the hearing, led the juvenile court to find that the children needed continued shelter care. The juvenile court therefore placed the children in the temporary legal and physical custody of DFS for appropriate placement. The court additionally ordered DFS to provide case management.

[¶ 5] On December 19, 2001, the district court held an initial hearing on the petition. Again, Father did not attend the hearing. At the hearing, Mother stated that she was in agreement with an adjudication of neglect. The court then stated that it would "adjudicate the case based upon the petition that [is] not objected to and the affidavit of [DFS]." The court found that it was neither appropriate nor in the children's best interest to remain in the family's home. In its order of placement following the hearing, the juvenile court noted that Mother "admitted and consented to the Court's jurisdiction and disposition" and ordered that the children remain in the legal and physical custody of DFS. The court also ordered DFS to make reasonable efforts to reunite the family and that a multidisciplinary team (MDT) be appointed to make recommendations and provide the court with a report for disposition of the matter.

[¶ 6] The MDT first met on January 11, 2002. Mother appeared by telephone and

reported Father had a negative effect on her and the children, Father had a history of becoming physically violent, and she had significant concerns for the children's safety if Father were allowed to care for them. The MDT considered this information and the needs of the children and determined that both children needed consistent contact with Mother, an environment free from violence, and parents that were drug and alcohol free. The MDT also noted that Mother had "huge potential" due to her bonding with the children, positive family support, her intelligence, and stated willingness to make changes. The recommended placement goal at that time was for the children to be reunified with Mother or Father. To achieve reunification with her children, the MDT recommended that Mother complete the following objectives:

1) Attend and successfully complete the drug treatment program at the Women's Center.

2) Comply with all recommendations made throughout the treatment program.

3) Attend and complete parenting classes available at the Women's Center.

4) Complete her GED.

5) Participate in individual counseling. She will address co-dependency tendencies, self-esteem, her tendency to self-sabotage, and overall relationship issues.

6) Pay child support of $10.00 per month, per child. She will comply with Child Support Enforcement. Their requirements of child support will override this recommended amount.

7) Remain drug and alcohol free.

Following this meeting, Mother received and signed the prepared case plan that contained these objectives.

[¶ 7] On January 23, 2002, the juvenile court held a dispositional hearing. The juvenile court found that custody should be continued in DFS and ordered DFS to continue to make reasonable efforts to reunite the children with their family. The juvenile court also ordered the parents to cooperate with DFS and the case plan for reunification. Lastly, the court ordered that the MDT reconvene in six months to review the case and make recommendations to the court. On April 29, 2002, DFS filed a report with the court which summarized the progress Mother had made on the case plan. The report indicated the permanency plan for HP and NP was family reunification with Mother. In the report DFS recommended that the children remain in foster care until Mother was released from prison and had obtained employment and a home for her and the children.

[¶ 8] The MDT met a second time on July 1, 2002, and a third time on November 12, 2002. Mother again participated in these meetings by phone. The MDT noted Mother's progress with the case plan, such as the completion of her GED, but also noted problems encountered at the Women's Center, including being fired from employment. The team continued to recommend that the children be reunified with Mother and set forth the objectives Mother needed to complete before reunification could be achieved. These objectives were substantially similar to the ones noted previously. At the third meeting the team agreed that it was important for the case to remain open to allow Mother to work toward reunification after she was released from the Women's Center in March 2003. Following this meeting, the MDT submitted a report to the court and recommended the court consider that Mother was in prison until March of 2003 a compelling reason not to terminate Mother's parental rights. At the third meeting Mother also noted that she was planning to live at Life Steps Transitional Housing upon her release from prison.

[¶ 9] A fourth MDT meeting was held on February 21, 2003, in anticipation of Mother's release from prison. At that time, the MDT recommended that the children be reunified with Mother upon her satisfactory completion of her DFS case plan. Following this meeting Mother received and signed another case plan, which contained eight objectives:

1. Obtain suitable housing,

2. Maintain steady and suitable employment,

3. Enroll in and complete parenting classes,

4. Attend individual counseling,

5. Have supervised visitation with her children,

6. Keep in constant contact with DFS and CASA—keeping them aware of any and all changes,

7. Remain free of any illegal substances, and

8. Fully cooperate with a Family Assistance Worker.

The team also worked with Mother regarding housing arrangements, employment, transportation to visit the children, childcare services, Title XIX, and medical coverage for the children. Mother was released from the Women's Center on the anticipated date, and DFS placed the children with her on March 28, 2003.

[¶ 10] On May 2, 2003, the juvenile court held another review hearing. At the time of the hearing, the case had been ongoing for seventeen months. Prior to the hearing, DFS filed a report with the court. In the report the MDT appeared optimistic about Mother's progress. A CASA/Co–GAL report outlined Mother's home, employment, enrollment in a parenting class, and her child support payments. Based on the MDT's positive report, the court ordered legal custody of the children to DFS and physical custody of the children to Mother. The court further ordered that the matter "shall not continue for more than three (3) months absent further request for a hearing in this matter."

[¶ 11] However, DFS learned of several problems shortly after the May 2, 2003 review hearing. These problems were noted at a May 20, 2003 MDT meeting. Specifically, Mother was unemployed. Additionally, within five days of the May 2, 2003 review hearing, Mother had been evicted from Life Steps housing. The eviction was reportedly the result of a failure to follow Life Steps' guidelines. In particular, Mother was not doing her chores, not meeting with her case manager weekly, and not abiding by curfew. In addition, Mother left her children unsupervised as she slept or talked on the phone, left the children with other residents without approval from Life Steps' staff, and was suspected of using alcohol at the facility. At this meeting, Mother disputed that she was evicted due to alcohol use but did admit that she went out a lot and that she had been intoxicated after the children had been placed with her. Mother also claimed that she had not left the children unattended but had asked a babysitter to look in on the children periodically. On May 7, 2003, Mother returned the children to DFS, and they were placed in a new foster home.

[¶ 12] Another problem discussed was that Mother allowed Father to have contact with the children and allowed the children to ride in a vehicle without proper safety restraints. Specifically, Mother and the children were riding in a car with Father when he was arrested. Mother was holding NP on her lap, and HP was not properly restrained in the back seat. When Father was pulled over, he admitted to police that he had used methamphetamine earlier that day and had consumed alcohol. The police found a hypodermic needle and empty beer cans in the car. Also, Father slurred his speech and had bloodshot eyes. Mother claimed that she was unaware that Father was under the influence of drugs or alcohol.

[¶ 13] At this meeting the MDT prepared a revised case plan, which Mother received and signed. This plan included eight objectives: obtain suitable housing within thirty days, obtain steady and suitable employment within thirty days, complete parenting classes, attend individual counseling, submit to random urine analysis, keep in constant contact with DFS and CASA and be honest and forthright about all pertinent information, not have any contact with Father, and cooperate with visitation set up by DFS. The MDT also recommended that if Mother had not made significant progress on her plan within thirty days, the concurrent plan was to recommend termination of parental rights.

[¶ 14] The juvenile court held another review hearing on June 4, 2003. Due to the eighteen months that the case had been pending, the juvenile court expressed reluctance to allow the case to proceed without achieving permanency for the children. The State advised the court of the problems recently brought to the MDT's attention. In

particular, Mother was having contact with Father, Mother was leaving the children without appropriate supervision, and she was using alcohol in an inappropriate manner. Additional concerns were raised that after Mother was evicted from Life Steps, she moved in with a boyfriend but would not disclose information about this man to DFS. At the hearing the district court made the finding that exceptional circumstances existed to warrant continuing the case, but that Mother must comply with the DFS plan for reunification within forty-five days.

[¶ 15] On July 1, 2003, the MDT held a sixth meeting. There DFS advised the MDT that Mother had obtained a job at Wendy's, but that she quit this job and now worked for a man named Impong. Pay stubs could not be obtained for this work, and it was reported that Mother did not receive a paycheck. Instead, Impong paid her rent and other bills as needed. The MDT also learned that Mother missed appointments with her counselor, and the counselor then refused to see her. In addition, MDT members reported that Mother was living with or sometimes staying with Impong, and his name was on the lease for Mother's apartment. A DFS report to the court noted these facts and that Mother was evasive about her relationship with Impong, but that she was completely dependant on Impong for her financial and housing needs. The MDT recommended that parental rights be terminated.

[¶ 16] On August 6, 2003, the juvenile court held a dispositional review hearing. The court made three findings by clear and convincing evidence: 1) reasonable efforts have been made to reunify the family; 2) there have been ongoing and persistent failures on behalf of Mother to comply with basic plan requirements; and 3) the children's health and safety would be jeopardized by returning the children to Mother. In making its findings at the review hearing the court stated, "just by the passage of time and the large, large number of efforts that have been involved with this case that there have been reasonable efforts to rehabilitate; that there have been ongoing, persistent, and continued failures on the part of [Mother] to seek and maintain some stability in housing,

a safe environment, employment, counseling, and the other just basics that would need to be implemented.". The juvenile court then ordered that the case remain open for six months, legal and physical custody remain with DFS, and that DFS pursue termination of parental rights. Mother appeals this order.

## STANDARD OF REVIEW

[¶ 17] We understand Mother's argument to challenge the sufficiency of the evidence supporting the juvenile court's findings. When reviewing a record for sufficient evidence to sustain a finding of neglect, we:

1. Give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;

2. Examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee;

3. Assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*DH v. Dep't of Family Servs. (In re "H" Children)*, 2003 WY 155, ¶ 54, 79 P.3d 997, ¶ 54 (Wyo.2003) (quoting *MP v. State in Interest of CP*, 965 P.2d 1155, 1157 (Wyo.1998)).

## DISCUSSION

### Findings of Fact

[¶ 18] In order to facilitate our discussion of the issues presented by the parties, we find it necessary to briefly review the procedural process of this case. This matter came before the juvenile court as the result of a petition alleging neglect as defined by Wyo. Stat. Ann § 14–3–401 through –439 (LexisNexis 2003), the Child Protection Act. Under the Child Protection Act, a neglected child is defined as a child "[w]hose custodian has failed or refused to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being." Wyo. Stat. Ann. § 14–3–402(a)(xii)(A). Allegations of neglect under the Act must be proved by a prepon-

derance of the evidence. Wyo. Stat. Ann. § 14–3–425(a).

[¶ 19] In her brief, Mother states that the petition only alleged neglect against Father. In reviewing the petition we see that it alleged that the children were "without proper care and control or lack subsistence, maintenance, education required by law, medical care or treatment or supervision necessary for said children's health and welfare because of omissions of said children's parents." Hence, the petition did not specify a particular parent but included both parents. Furthermore, at the initial hearing held on December 19, 2001, Mother admitted and consented to the court's jurisdiction and disposition. We therefore conclude the petition of neglect involved Mother.

[¶ 20] As noted in the fact section, at the initial hearing Mother stated that she was in agreement with an adjudication of neglect, and the court stated that it would "adjudicate the case based upon the petition that's not objected to and the affidavit of [DFS]." However, following the initial hearing, it appears that there is no separate decree of neglect against Mother. We note, as we did in *In re "H" Children*, ¶ 63, we are somewhat concerned by the lack of a decree. Wyo. Stat. Ann. § 14–3–402(a)(i) contemplates a separate decree of neglect, and § 14–3–426(c) requires entry of a decree. *Id.* Nevertheless, the lack of a separate decree is not specifically raised as an issue in this case, and we will not consider it further.

[¶ 21] What we do find in the record following the initial hearing is an Order for Placement. This order does not specifically use the word "neglect" or make a specific finding of neglect against Mother. However, it does state that the court "hereby adjudicates and takes jurisdiction over this matter" and specifically finds that Mother was sentenced to the Wyoming State Penitentiary. As defined by the Child Protection Act, "adjudication" is "a finding by the court or the jury, incorporated in a decree, as to the truth of the facts alleged in the petition." Wyo. Stat. Ann. § 14–3–402(a)(i). By specifically stating that it "adjudicates" the matter, the juvenile court made a finding that the facts alleged in the petition were true. We con-

clude that this statement, combined with the court's specific finding that Mother was in prison, was a finding of neglect against Mother. In fact later at the August 6, 2003 review hearing, the juvenile court explained that Mother's incarceration and inability to care for the children constituted neglect. We have previously allowed orders that do not specifically use the word "neglect" but do contain findings tantamount to neglect to constitute findings of neglect. *See In Interest of C*, 638 P.2d 165, 172 (Wyo.1981); *In Interest of MFB*, 860 P.2d 1140, 1151 (Wyo. 1993). We similarly find that in this case the court made a finding of neglect against Mother.

[¶ 22] Having found that the juvenile court did make a finding of neglect against Mother, we additionally conclude that there was sufficient evidence for the court to make such a finding. At the time the petition was filed, Mother was incarcerated and unable to care for the children. The whereabouts of Father were unknown. The children were left with Father's parents who could not care for them, and no one else had been provided to care for the children. As such, we hold that there was sufficient evidence for the juvenile court to find by a preponderance of the evidence that the children were neglected inasmuch as Mother had failed to provide adequate care for the children's well-being.

[¶ 23] This finally leads us to the order Mother specifically appeals. This order states:

> AND THE COURT FINDS by clear and convincing evidence that reasonable efforts have been made to reunify the family and that there have been ongoing and persistent failures on behalf of the mother of the minor children, [Mother], to comply with basic case plan requirements and that the children's health and safety would be jeopardized by returning the children to the mother; FURTHER, that the said father of the minor children is incarcerated.
>
> . . .
>
> IT IS FURTHER ORDERED that this matter shall continue for six (6) months; and that the Department of Family Ser-

vices shall pursue Termination of Parental Rights.

IT IS FURTHER ORDERED that the previous Court orders and conditions not amended herein shall be continued.

Because the order specifically continues the case for six months, at first glance it may not appear to be an appealable order. However, under W.R.A.P. 1.05(b), an order affecting a substantial right made in a special proceeding is an appealable order. "Proceedings in juvenile court are special proceedings and both adjudication and disposition affect substantial rights." *In re "H" Children*, ¶ 61. As discussed above, the court adjudicated neglect following the initial hearing. This order did however follow a dispositional review hearing and appears to be a dispositional order because it orders DFS to begin termination proceedings. In any event, the order certainly affects Mother's substantial rights as it has the effect of halting reunification attempts. Therefore, we will treat it as an appealable order. *Id.*, at ¶ 64.

[¶ 24] On appeal, Mother argues that the juvenile court erred in finding by clear and convincing evidence that reasonable efforts have been made to reunify the family, that there have been ongoing and persistent failures on behalf of Mother to comply with basic case plan requirements, and that the children's health and safety would be jeopardized by returning the children to Mother. As provided by statute, the juvenile court is charged with conducting:

a review hearing six (6) months from the date of the child's removal from the home, twelve (12) months from the date of the child's removal from the home, and not less than once every twelve (12) months thereafter. At each of these review hearings the court shall review the case plan to determine:

(i) The health and safety of the child;

(ii) The continuing necessity for the placement;

(iii) The appropriateness of the current placement;

(iv) The reasonableness of efforts made to reunify the family and the consistency of those efforts with the case plan;

(v) The appropriateness of the case plan and the extent of compliance with the case plan including the permanent placement of the child;

(vi) If progress has been made toward alleviating or mitigating the causes necessitating placement outside the home and the extent of that progress; and

(vii) The date the child is expected to be returned to the home or placed for adoption or legal guardianship.

Wyo. Stat. Ann. § 14–3–431(c). These criteria help the court determine the appropriateness of its disposition, and it appears that it is in this context that the juvenile court made the findings Mother claims were in error.

[¶ 25] Mother's argument on this issue is framed as a challenge to the sufficiency of the evidence. As we have previously explained, termination of parental rights requires clear and convincing evidence, but child neglect need only be shown by a preponderance of the evidence. *In re "H" Children*, ¶ 39. "In the realm of due process, this is consonant with the requirement that notice and the opportunity to be heard must be appropriate to the nature of the case." *Id.* Additionally, Wyo. Stat. Ann. § 14–3–424(a) provides that hearings under the Child Protection Act are to be conducted in "an *informal* but orderly manner and separate from other proceedings not included under this act." (Emphasis added.) Thus, the formalities of the proceedings themselves and the notice and opportunity to be heard provided in a neglect proceeding are not the same as that in a termination proceeding.[1] Accordingly, we review the court's findings only in the context of a review hearing in a neglect proceeding and under the preponderance of the evidence standard that is applicable to neglect proceedings. *See* Wyo. Stat. Ann. § 14–3–425; *In re "H" Children*, ¶ 39; *but see* Wyo. Stat. Ann. § 14–3–429(a)(iv)

---

1. The GAL's statement of the issues states that the court found by clear and convincing evidence that Mother's parental rights should be terminated. However, this was not a termination proceeding and, as noted above, the court's findings are in the context of a review hearing in a neglect proceeding.

where clear and convincing evidence is required to show that reasonable efforts were made to prevent the initial removal from the home.[2] Although the juvenile court's findings in this case may be similar to several of the findings required in order to terminate parental rights, they must be fully litigated in a termination proceeding under the applicable clear and convincing standard. *See In re "H" Children,* ¶ 39; Wyo. Stat. Ann. § 14-2-309(a)(iii).

■ [¶ 26] The juvenile court's first finding is that there had been reasonable efforts to reunify the family. *See* Wyo. Stat. Ann. § 14-3-431(c)(iv). We conclude that there was sufficient evidence for the juvenile court to make this determination. Six MDT meetings were held to assess the case. At each of these meetings the MDT encouraged Mother to complete her case plan and offered assistance. The MDT wrote four case plans for Mother that outlined the steps she would have to take to achieve reunification. While Mother was incarcerated, the MDT tailored case plans to her situation. DFS arranged overnight-unsupervised visits between the children's maternal grandmother and the children while Mother was incarcerated. This allowed Mother visitation with her children because her mother took the children to the Women's Center twice a month. Additionally, the MDT requested and the court appointed a CASA worker to facilitate providing services to Mother and the children. Immediately upon her release from the Women's Center, Mother was allowed visitation with the children, and the children were allowed to live with Mother within two weeks of her release. DFS offered Mother transportation to visitation, recommended Mother for counseling services, and assisted Mother in procuring suitable housing. It is true that the rehabilitative efforts after Mother was released from the Women's Center were short lived. However, over the course of the plan the above-noted facts show that reasonable efforts were made to reunify the family.

■ [¶ 27] Next, the court found that there were ongoing and persistent failures by Mother to comply with the case plan. *See* § 14-3-431(c)(v) and (vi). Mother argues that she complied with the case plan. She asserts that the MDT recommended termination based on criteria that were never a part of the written case plan, for example, that she had contact with Father and that she consumed alcohol. These issues aside, part of Mother's case plan was to obtain suitable housing, that she maintain steady and suitable employment, and that she properly care for the children.

[¶ 28] Mother was evicted due to her violation of the rules at transitional housing. Mother then chose to move in with Impong, but would not give DFS information about him so that DFS could ensure that the children would be safe around him and that the housing was "safe, stable, and secure." Similarly, Mother left her job on her own volition and then began working for Impong who "would be paying her under the table and she would never get a formal paycheck." In fact, the letter Mother obtained from Impong stated that her "income has yet to be determined, and may be subject to fluctuational changes." As such, her work could be characterized as less than steady and suitable. It was documented that Mother was leaving the children unattended or without suitable attention. Thus, we conclude that in the context of a review hearing this evidence is sufficient in itself for the juvenile court to find that Mother has failed to comply with the case plan which meant that progress was not being made toward alleviating or mitigating the causes necessitating placement outside the home.

■ [¶ 29] Likewise, there was sufficient evidence for the court to find that the children would be jeopardized by return to Mother's custody. *See* § 14-3-431(c)(i), (ii), (vi), and (vii). Mother exposed the children to drugs and alcohol. Mother drank herself to the point of intoxication, leaving her unable to care for the children. The children were exposed to drugs because of Mother's contact with Father who had drug paraphernalia and was under the influence of drugs. Mother allowed the children to ride in a car where the driver was intoxicated. The children were additionally exposed to instability

---

2. As noted in the fact section, such a finding in this case was made at the initial hearing.

due to Mother's lack of employment and housing. Furthermore, it was Mother who alerted DFS to safety concerns when the children were with Father, yet she disregarded this safety concern. These facts combine to show that the children were currently in jeopardy and could not be immediately returned to Mother.

[¶ 30] At the time of the final review hearing, this case had been pending for nineteen months. With few exceptions, Wyo. Stat. Ann. § 14–3–431(d) requires the State file a petition to terminate parental rights when a child has been placed in foster care under the responsibility of the State for fifteen of the most recent twenty-two months. One such exception is if the state agency has documented a compelling reason that the filing of the petition is not in the best interests of the child. Wyo. Stat. Ann. § 14–3–431(d)(ii). As part of her argument Mother asserts that the MDT had documented, and the court had found, a compelling reason not to terminate Mother's parental rights because she was incarcerated. Once Mother was released and had an opportunity to attempt reunification, even though such an opportunity was short lived, the juvenile court was well within its rights to determine that this compelling reason no longer existed.

[¶ 31] We, therefore, find that there was sufficient evidence for the court to make these findings in the context of a review hearing in a neglect proceeding. As such, the court's disposition was that DFS no longer had to make attempts to reunify the family. Based on the circumstances and the evidence presented, we do not believe the court erred in making these determinations and ordering DFS to begin termination proceedings.

### Fundamental Rights

[¶ 32] Mother's second issue is that her fundamental rights were violated by the MDT's decision to recommend terminating her parental rights. The thrust of Mother's argument is that at the June 4, 2003 review hearing, the court gave her forty-five days to comply with her case plan, yet the MDT recommended well before expiration of this time that termination be pursued. We conclude that the MDT's actions did not violate Mother's fundamental rights. Certainly, as Mother asserts, the application of the termination of parental rights statutes is a matter for strict scrutiny. See SD v. Carbon County Dep't of Family Servs., 2002 WY 168, ¶ 5, 57 P.3d 1235, ¶ 5 (Wyo.2002). However, just as with the first issue, we must consider that this was a neglect proceeding, not a termination proceeding. The MDT does not have the power to terminate Mother's parental rights, but simply makes recommendations to the juvenile court. Additionally, while the court ordered DFS to begin termination proceedings, Mother's parental rights have not been terminated. Until actual termination occurs, Mother has residual parental rights. See Wyo. Stat. Ann. § 14–3–402(a)(x) (LexisNexis 2003).

[¶ 33] Furthermore, the court ordered Mother to comply with DFS requests for information. At the sixth MDT meeting it became apparent that Mother was reluctant to share information with DFS regarding her living situation and employment with Impong. Thus, it was apparent that DFS would not be able to verify whether Mother had complied with her case plan. It also appeared that future rehabilitative efforts would be unsuccessful, as Mother had adopted the attitude that what she did was her business and not that of DFS. Therefore the MDT decided to recommend termination of parental rights.

[¶ 34] Although the MDT recommended termination prior to the expiration of the forty-five-day time frame, it is clear the court did not order DFS to begin termination until after the period had elapsed. The MDT has no power to terminate parental rights, but merely makes a recommendation. It is the court's duty to determine disposition. Indeed, the juvenile court heard argument regarding the shortening of time but nevertheless decided to take the MDT's recommendation. Had the court found the MDT's actions to be in violation of its order, it could have ordered that Mother be extended more time to comply. Furthermore, Mother did not come to court and show that new strides had been made from the July 1, 2003 MDT meeting to the August 6, 2003

review hearing and has not shown how she was prejudiced by the MDT's actions. We therefore find Mother's arguments unpersuasive.

### CONCLUSION

[¶ 35] We affirm the court's Order Following Review Hearing. As described above, the State presented sufficient evidence for the juvenile court to make the contested findings in the context of a review hearing in a neglect proceeding. Additionally, Mother's fundamental rights were not violated.