# THE SUPREME COURT, STATE OF WYOMING

# 2024 WY 75

APRIL TERM, A.D. 2024

July 17, 2024

IN THE INTEREST OF RTB, minor child:

BLB,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-24-0019

*Appeal from the District Court of Carbon County*
*The Honorable Dawnessa A. Snyder, Judge*

*Representing Appellant:*
    Joshua J. Merseal of Merseal Law, LLC, Laramie, Wyoming.

*Representing Appellee:*
    Bridget L. Hill, Attorney General; Christina F. McCabe, Deputy Attorney General; Wendy S. Ross, Senior Assistant Attorney General; Callie R. Papoulas, Assistant Attorney General.

*Guardian ad Litem:*
    Joseph R. Belcher and Kimberly Skoutary Johnson of the Wyoming Office of the Guardian ad Litem.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN and JAROSH, JJ.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    Mother challenges several aspects of the proceedings leading to the juvenile court finding she neglected her four-year-old-child, RTB.  She argues the Rawlins Police Department improperly placed RTB in temporary protective custody, and the court had insufficient evidence to continue RTB's shelter care placement and find that Mother neglected RTB.  We affirm.

## *ISSUES*

[¶2]    Mother raises three issues:

> I.      Was [RTB] properly placed in protective custody pursuant to Wyo. Stat. Ann. § 14-3-405?
>
> II.     Did the juvenile court err in ordering [RTB] to be placed in shelter care pursuant to Wyo. Stat. Ann. § 14-3-409?
>
> III.    Did the juvenile court err when it determined that the State presented sufficient evidence to adjudicate [Mother] as a neglectful parent?

## *FACTS*

[¶3]    On Friday, July 21, 2023, Mother attended a medical appointment and performed a urinalysis (UA) test.  Mother's test results came back positive for methamphetamine, amphetamines, and marijuana.  Out of concern for RTB, the healthcare provider at the medical clinic reported Mother's UA results to the Department of Family Services (the Department) via phone call and fax.  The report arrived after the Department's normal workday hours.  Department staff did not see the report until early the following Monday, July 24.

[¶4]    A Department caseworker and an officer from the Rawlins Police Department went to Mother's home at midday that Monday.  Mother was living with her roommate, her seventeen-year-old nephew, and RTB. When the officer and caseworker arrived, Mother's roommate answered the door because Mother was sleeping.  Once she awoke, the officer explained why he and the caseworker came to her home and asked if she and her roommate would perform UA tests.  They both agreed, but Mother refused to let her nephew take the test because he had a leg injury and was on pain medication.  Mother again tested positive for methamphetamine, amphetamines, and marijuana.  Her roommate tested positive for alcohol and benzodiazepines, for which he had no prescription.

1

[¶5]    Mother told the officer she only smoked marijuana and had smoked it the previous Friday and Saturday.    She deduced the marijuana must have been laced with methamphetamine for her to test positive.  The officer took RTB into protective custody based on a Rawlin's Police Department policy of taking protective custody whenever any parent in a residence tests positive for methamphetamine and because there was no appropriate caregiver for RTB at the home.

[¶6]    The State filed a petition on July 27th alleging Mother neglected RTB.  That same day the juvenile court held a combined shelter care and initial hearing as permitted by Wyo. Stat. Ann. § 14-3-409(c).  Mother's appointed counsel entered a denial on her behalf.  After hearing from the Department, the GAL, and Mother's counsel, the court granted the Department legal custody of RTB for placement in non-familial foster care.

[¶7]    The court held a second initial hearing in August.  Mother continued to deny the State's allegation of neglect.  The court heard from the parties and the GAL that Mother tested negative for all substances, a drug dog had searched her home and did not find illegal drugs, and Mother had been cooperating with the Department.  The court then ordered RTB to be placed back with Mother.  The Department retained legal custody of RTB pending Mother's adjudicatory hearing.

[¶8]    Mother's adjudicatory hearing occurred in early October 2023.  During the hearing, the State presented testimony from a Department supervisor, the Rawlin's police officer who took RTB into protective custody, and Mother.  Mother testified and also called a family friend, her roommate, and RTB's father to testify.[1]  The GAL did not present witness testimony but cross-examined witnesses.  The court entered its written order finding Mother neglected RTB on October 23, 2023.  Mother timely appealed.

## DISCUSSION

### I.       Whether the Rawlins police officer properly placed RTB in protective custody.

[¶9]    Wyo. Stat. Ann. § 14-3-405(a)(i) (2023) states:

>   (a) A child, or any other child residing in the same household, may be taken into custody by a law enforcement officer without a warrant or court order and without the consent of the parents, guardians or others exercising temporary or permanent control over the child when:

---

[1] The record indicates RTB's father made his first appearance at the adjudicatory hearing.  He is not a party to this appeal.

(i) There are reasonable grounds to believe a child is . . . seriously endangered by the child's surroundings and immediate custody appears to be necessary for his protection[.]

[¶10]   Mother asserts the officer who took RTB into protective custody did so based solely on her positive UA test without having the reasonable grounds required under Wyo. Stat. Ann. § 14-3-405(a)(i) and, as such, "abused his discretion."  She relies on the officer's testimony from the adjudicatory hearing expressly acknowledging the Rawlins Police Department's procedure of taking protective custody of a child whenever any parent in a residence tests positive for methamphetamine.

[¶11]   It would be concerning if the Rawlins Police Department takes protective custody of children based solely on a parent's positive UA result without fully considering, as the statute requires, whether the child is "seriously endangered by [their] surroundings and immediate custody appears to be necessary for [their] protection[.]" *See id.*  In this case, however, the record from the shelter care hearing makes clear that law enforcement considered these statutory conditions prior to removing RTB from Mother's home.[2]  Law enforcement stated various reasons, in addition to Mother's positive UA test, why RTB was endangered if left at home and immediate custody was necessary for RTB's protection. We fully address the evidence presented at the shelter care hearing in the next section.

***II.***     ***Whether, following the first hearing, the juvenile court had sufficient evidence to conclude that continued shelter care was necessary to protect RTB's welfare.***

[¶12]   In shelter care hearings, the juvenile court:

> shall determine whether or not the child's full-time shelter care is required to protect the child's welfare pending further proceedings.  If the court determines that returning the child to the home is contrary to the welfare of the child, the court shall enter the finding on the record and order the child placed in the legal custody of the department of family services.

Wyo. Stat. Ann. § 14-3-409(d).  Mother challenges the juvenile court's order after the first shelter care hearing, arguing the court had no evidence of a "nexus" between her positive UA test and any danger to RTB at their residence.  She contends the sole allegation she was using methamphetamine is insufficient to justify RTB's continued removal.

---

[2]The juvenile court must hold a shelter care hearing "as soon as reasonably possible not later than forty-eight (48) hours, excluding weekends and legal holidays, after the child is taken into temporary protective custody[.]" Wyo. Stat. Ann. § 14-3-409(a).

[¶13] Mother's argument is framed as a challenge to the sufficiency of the evidence supporting the juvenile court's shelter care order. We apply the following principles when reviewing the sufficiency of the evidence:

> First, we give considerable deference to the [juvenile] court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses; second, we examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; and third, we assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*In re AE*, 2024 WY 28, ¶ 15, 544 P.3d 1113, 1116 (Wyo. 2024) (citations omitted); *see also In re HP*, 2004 WY 82, ¶¶ 25–26, 93 P.3d 982, 989–90 (Wyo. 2004) (reviewing an order after review hearing for the sufficiency of the evidence when the appellant framed the issue as such). We note in shelter care hearings the juvenile court is permitted to consider "[a]ll relevant and material evidence helpful in determining the need for shelter care" and such evidence "may be admitted by the court even though not competent in an adjudicatory hearing on the allegations of the petition." Wyo. Stat. Ann. § 14-3-409(e).

[¶14] In its first shelter care order, the juvenile court found "by clear and convincing evidence that shelter care of the minor child is necessary" based on the circumstances surrounding RTB being taken into protective custody.[3] The record supports the court's finding. The court considered the affidavit in the State's neglect petition in making its decision. The affidavit contained statements from the Department caseworker explaining (1) the report the Department received detailing Mother's positive UA test for methamphetamine at her medical appointment, (2) Mother claimed she only smoked marijuana and that it must have been laced with methamphetamine if she tested positive, (3) Mother's roommate answering the door when the caseworker and officer arrived, (4) the roommate testing positive for benzodiazepines with no prescription, and (5) the officer's statements about arriving at Mother's home when she was sleeping and Mother again testing positive for methamphetamine.

---

[3] Our precedent does not clearly set forth the burden of proof the State must satisfy at a shelter care hearing. *See HP*, 2004 WY 82, ¶ 25, 93 P.3d at 989–90 ("Accordingly, we review the court's findings only in the context of a review hearing in a neglect proceeding and under the preponderance of the evidence standard that is applicable to neglect proceedings. *See* Wyo. Stat. Ann. § 14-3-425; []; *but see* Wyo. Stat. Ann. § 14-3-429(a)(iv) where clear and convincing evidence is required to show that reasonable efforts were made to prevent the initial removal from the home."). Because the parties do not dispute the "clear and convincing" standard the juvenile court applied, we analyze the sufficiency of the State's evidence under that same standard, leaving any further consideration of the appropriate standard for another day.

[¶15] The court heard directly from the State, the caseworker, the GAL, and Mother's counsel, each of whom referred to statements in the affidavit. The State explained the Department did not consider Mother's roommate for placement at the time the officer took RTB into protective custody because he tested positive for benzodiazepines and had no prescription. The caseworker and the GAL stated an older minor was also in the home when the officer took RTB into protective custody. The caseworker testified Mother would not let the minor be tested since the child had a broken leg and was laid up in bed. Thus, each potential caretaker at RTB's home had either tested positive for illicit substances or was injured and immobile. Equally important, evidence at the shelter care hearing and every favorable inference to be drawn from that evidence established that Mother twice tested positive for methamphetamine, and she still had it in her system when the officer took RTB into protective custody. Under these circumstances, the juvenile court considered more than Mother's positive UA tests and had sufficient evidence to conclude that returning RTB to their home would be contrary to RTB's welfare. *See AE*, 2024 WY 28, ¶ 15, 544 P.3d at 1116 (citation omitted); Wyo. Stat. Ann. § 14-3-409(d).

### III. *Whether the juvenile court had sufficient evidence following the adjudicatory hearing to conclude Mother neglected RTB.*

[¶16] We apply the same principles articulated above to review the sufficiency of the evidence supporting the juvenile court's order finding Mother neglected RTB. *AE*, 2024 WY 28, ¶ 15, 544 P.3d at 1116 (citation omitted). We assume all evidence in the State's favor is true and afford the State every favorable inference. *Id.*

[¶17] "Neglect" is defined as "a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being." Wyo. Stat. Ann. § 14-3-202(a)(vii). During the adjudicatory hearing, the State had the burden to prove its allegations of neglect by a preponderance of the evidence. Wyo. Stat. Ann. § 14-3-425(a); *AE*, 2024 WY 28, ¶ 16, 544 P.3d at 1116 (citations omitted). A preponderance is proof "it was more likely than not that neglect occurred." *In re "H" Child.*, 2003 WY 155, ¶ 54, 79 P.3d 997, 1012–13 (Wyo. 2003) (citation omitted).

[¶18] Similar to her argument challenging the juvenile court's shelter care order, Mother argues the State's evidence was insufficient to support an adjudication she neglected RTB because it did not show a "nexus" between her positive UA test and the alleged neglect. She contends the court treated her positive UA test as per se evidence of neglect based on the Department's statements and the Rawlin's Police Department's policy of taking protective custody of a child any time a parent in a residence tests positive for methamphetamine. Mother's argument that a "nexus" must exist between a positive UA test and a finding of neglect is well taken because the statute requires, via the definition of neglect, that the evidence must show Mother failed to provide RTB adequate care,

5

maintenance, supervision, or other necessary care.[4]  *See* § Wyo. Stat. Ann. 14-3-202(a)(vii).

[¶19]   The juvenile court found Mother failed to provide proper supervision or adequate responsive care to RTB.  The court based this finding on: (1) Mother's admission that she had smoked laced marijuana twice on the Friday and once on the Saturday prior to RTB's removal, (2) Mother's statements that she left the home when she smoked marijuana, (3) her roommate's statements that he could not recall watching RTB during those times, (4) Mother's erratic behavior at her medical appointment as detailed in her healthcare provider's report, (5) Mother's behavior in front of the officer and the Department while they were at her home, namely, that she was sleeping when they arrived midday and exhibited erratic behavior and tiredness consistent with the effects of coming down from methamphetamine use.   The court also found Mother's claims that she involuntarily ingested methamphetamine and did not notice its effects to be less than credible.[5]

[¶20]   The record supports these findings.  Mother conceded the UA tests performed at her medical appointment and at her home were positive for methamphetamine, amphetamine, and marijuana.  During the adjudicatory hearing, she acknowledged her prior history of methamphetamine use but stated she no longer used it.  She asserted she only occasionally smoked marijuana away from the home.  She testified to smoking marijuana the Friday and Saturday before the Department visited her home, though she claimed she did not know it was laced with methamphetamine.  Mother's roommate testified he lived with Mother and would watch RTB when Mother needed a break.  He also testified he did not recall watching RTB the weekend prior to the State taking RTB into protective custody.

[¶21]   The juvenile court also heard testimony from the Department supervisor familiar with Mother's case and the officer who took RTB into protective custody.  The supervisor testified to the report it received from her healthcare provider, explaining that when a nurse asked Mother to perform a UA test, she resisted, pulled the chart out of the nurse's hand, and became "very irate."  The supervisor also mentioned that Mother again tested positive for methamphetamine the following Monday at her home, her roommate tested positive for benzodiazepines and alcohol, and under those circumstances, no one in the home could appropriately care for RTB.  The supervisor further testified Mother's behavior at her home was "irate," "out of sorts," and "erratic."  The supervisor explained her behavior was concerning because the methamphetamine was still in her system several days after her positive test the previous Friday, methamphetamine is known to cause individuals to respond inappropriately and behave in ways that may cause physical or mental injury to a

---

[4] The State did not allege the other types of neglect defined in Wyo. Stat. Ann. § 14-3-202(a)(vii).

[5] Mother provided marijuana to the officer the day after he took RTB into protective custody, claiming it came from the same source as the marijuana she smoked previously.  The marijuana tested positive for methamphetamine.

child, and coming down from such use often causes the user to sleep for irrationally long times which may pose a danger to a child.

[¶22] The officer's testimony supported the supervisor. The officer testified to meeting the caseworker at Mother's home midday. He confirmed that when they arrived Mother's roommate answered the door and informed them Mother was sleeping. Once Mother was present, the officer stated he confronted Mother with the positive UA test from the medical appointment. He testified that after Mother again tested positive for methamphetamine, she suggested the marijuana she smoked must have been laced with methamphetamine. The officer testified he decided to take RTB into protective custody because, in addition to the Rawlin's Police Department policy of taking such custody whenever a parent tests positive for methamphetamine, the other potential caregivers in the home also had drugs in their system or were immobilized by injury and thus the child could not remain in the home safely. Viewing this evidence as true, and giving the State every favorable inference, the record is sufficient to support the juvenile court's finding that Mother neglected RTB. *AE*, 2024 WY 28, ¶ 15, 544 P.3d at 1116 (citations omitted).

[¶23] Affirmed.